NA'IL BENJAMIN, ESQ., (SBN 240345)
BENJAMIN LAW GROUP, P.C.
101 California Street, Suite 2710
San Francisco, California 94111
Telephone: (415) 633-8833
Facsimile:  (415) 349-3334
nbenjamin@benjaminlawgroup.com

Attorney for Plaintiffs
JONA TRBOVICH, SHONDA SANTOS
and SEAN ALLEN

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| SEAN ALLEN, an individual; SHONDA SANTOS, an individual; and JONA TRBOVICH, an individual,<br><br>    Plaintiffs,<br><br>    v.<br><br>COUNTY OF SANTA CLARA, a public entity; Douglas Ulrich in his individual and official capacities; Laurie Smith, in her individual and official capacities; and DOES 1 - 100, inclusive<br><br>    Defendants. | CASE NO.: _____<br><br>**COMPLAINT FOR DAMAGES FOR:**<br><br>1. **VIOLATION OF CIVIL RIGHTS (TITLE VII);**<br>2. **VIOLATION OF THE CALIFORNIA FAIR EMPLOYMENT & HOUSING ACT (FEHA);**<br>3. **VIOLATION OF 42 U.S.C. SECTION 1983;**<br>4. **VIOLATION OF CALIFORNIA CONSTITUTION ARTICLE I, §31;**<br>5. **VIOLATION OF 19 U.S.C. SECTION 1981;**<br>6. **INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS;**<br>7. **FAILURE TO TRAIN/SUPERVISE UNDER 42 U.S.C. §1983 AND PUBLIC POLICY**<br>8. **RETALIATION IN VIOLATION OF THE FIRST AMENDMENT**<br><br>**DEMAND FOR JURY TRIAL** |

COMPLAINT FOR DAMAGES                                                                                              CASE NO. _____

# INTRODUCTION

Plaintiffs JONA TRBOVICH, an individual; SHONDA SANTOS, an individual; and SEAN ALLEN, an individual (collectively "Plaintiffs"), seek redress against the COUNTY OF SANTA CLARA, a public entity ("Defendants"), individuals Douglas Ulrich, Laurie Smith, and DOES 1-100, inclusive, and each of them, as follows:

# JURISDICTION AND VENUE

1. This Court has jurisdiction of this action under 28 U.S.C. §1331 because the matter in controversy exceeds $75,000, exclusive of interest and costs, and arises under federal law.

2. Venue is proper in the Northern District of California pursuant to 28 U.S.C. §1391(b)(1) because Defendants reside within this judicial district and the events or omissions giving rise to this action occurred in this judicial district.

# THE PARTIES

3. Plaintiff Jona Trbovich is an individual previously employed as a Correctional Officer for the County of Santa Clara.

4. Plaintiff Shonda Santos is an individual currently employed as a Correctional Officer for the County of Santa Clara

5. Plaintiff Sean Allen is an individual employed as a Correctional Officer for the County of Santa Clara.

6. Defendant County of Santa Clara is a public entity responsible for controlling, managing, maintaining, and complying with all laws that relate to the Santa Clara County Jail (the "Jail").

7. The County also employs the Correctional Officers and the Sheriffs hired to work at the Jail.

8. Defendant Douglas Ulrich is an individual employed as a Sergeant at the Jail.

9. Defendant Laurie Smith is an individual and official elected to serve as the Sheriff over the Jail.

## STATEMENT OF FACTS

10. For at least the last 20 years, the Sheriff's Department ("Department") has had a custom and practice of discriminating against African Americans, and subjecting them to hostile work environments.

11. The County of Santa Clara has employed Plaintiff Sean Allen at its Jail for approximately 20 years.

12. He has witnessed and learned of the Department's history marginalizing African American employees. This historic custom and practice includes disparate treatment in the Department's hiring practices, assignments, promotions, and terminations.

13. It also includes subjecting African American employees to racially offensive slurs, harsh reprisals in response to complaints, threats and targeting in response to complaints, ignoring complaints and choosing not to investigate them, nepotism and favoritism, and abusive and offensive language relating to race with respect to sexually harassing conduct.

14. Since the 1990's, the Department has hand-picked applicants that were not African American while ignoring similarly qualified African American, and better qualified African American applicants. This process has typically started with respect to background checks. For example, the Sheriff and other decision-makers routinely used their subjective standards to disqualify African American candidates based on a random background-related issue. However, they allowed non-African American candidates to proceed to the next step of the process although they had similar, or worse, background issues.

15. This practice has continued regardless of the Sheriff, and continues through this day.

16. By way of example, African American applicants with celebrated performances as correctional officers with the Department of Corrections ("DOC") would be denied employment at the Jail many times because of some discretionary complaint relating to their performance while working at the Jail. However, non-African American employees committed the same acts, and sometimes worse acts, but they would be hired as permanent employees.

17. The Department also re-hired Caucasian employees that had committed terrible and egregious acts, yet refused to hire some African Americans, and fired others, for acts that were not

nearly as bad as those that led to the Caucasian employees to be fired. For example, in around 1995, several officers killed an inmate and were fired after the County was sued. But after the County paid a large settlement for their conduct, the County and Department rehired these Caucasian officers. These same officers were ultimately promoted.

18. Another example includes the County's decision to hire Officer Johnson from the DOC. On information and belief, the DOC terminated Johnson for lying to her superiors. But the Department ignored that termination, and the bases for the termination, and hired her to work the jails.

19. Sean Allen, however, applied for a position in the Department and his application was initially denied. Allen is African American. He was accused of providing inconsistent answers in his application. But in reality, the questions asked for different information. The Department denied his application due to an ambiguity in the application, but it hired a Caucasian applicant despite that applicant being terminated for dishonesty to her prior employer.

20. These types of disparities were also evident with respect to assignments in the Department. For at least the last 20 years, when African Americans were hired, they were typically required to work in the custody/direct supervision aspect of the job duties. In other words, they were limited to roles requiring them to work inside the jails. Non-African Americans were allowed to work, and given access to, jobs that were higher profile and more prestigious. Most of those jobs did not require employees to work inside of housing units in the jail.

21. Additionally, female employees that were known to have relationships with African American men were assigned to direct supervision roles, and precluded from the prestigious enforcement jobs that were outside of the direct supervision environments.

22. Moreover, in at least the last 14 years, the Department has promoted only one African American to a rank beyond Sergeant. Sergeant is the lowest level promotion in the Department. That promotion occurred only a few months ago. Similar facts are true regarding Sherriff Smith's refusal to accept "application packets" from African American correctional officers attempting to apply to become Sherriffs. She has wrongfully refused to accept packets from

African Americans, but she has allowed non-African Americans to re-take exams they have failed and reapply for positions as Sherriffs.

23. The Department's supervising officers and decision-makers also created an environment that was hostile for African Americans. That hostility was not limited to harsher discipline and race-based job assignments. The harassment was often times overtly racial and intended to offend, embarrass, intimidate, and infuriate African American employees.

24. For example, on information and belief, Sergeant Joel Church and another officer hung a confederate flag inside the employees' working environment. None of the Caucasian officers or managing officers, including the Sheriff, complained about this flag. African American's complained, but instead of the flag being removed from the workplace, these racist officers were allowed to hang the flags in their cars while the cars were parked in the employee parking lot.

25. As another example, a Sergeant named Larry Goodman told Allen that "black guys" are like OJ Simpson: they are all guilty but they beat their cases.

26. As another example, Ed Perry, an Assistant Chief, previously used the word "nigger" in the workplace. Sean Allen complained about Perry's conduct, but Allen's complaint was ignored. Notably, Perry committed these racially harassing acts in 2002 before he became Assistant Chief. But Perry ultimately promoted to this high rank notwithstanding his history of committing racially offensive acts in the workplace.

27. Ed Perry was not the only officer to openly use the word "nigger" in the jails or make other racially offensive remarks about African Americans. Plaintiffs Trbovich and Santos were called "mud sharks", "nigger lovers" and other racially offensive words because they had prior relationships with African American men. They were also verbally attacked, questioned, and spoken to with disdain, disgust, and disrespect by officers that expressed their disapproval and disappointment of Trbovich and Santos having romantic relationships with African American men.

28. Lieutenant Mitch Conner and Sergeant Morin repeatedly told Santos that they "would forgive her" for having sex with "blacks" if she slept with them. These comments were made numerous times for years, and some of them were made in front of Allen.

4
COMPLAINT FOR DAMAGES                                                                 CASE NO. _____

29. In fact, Sergeant Ulrich attempted to ban Santos from bringing coffee to, and checking on her African American friend, Officer Russell, while he was on duty but being denied a break.

30. Russell was forced to work long shifts without breaks, and would not be given relief when he needed to go to the bathroom. Santos, familiar with the stress and difficulty Russell was forced to endure at work, checked on him and brought him coffee during her breaks.

31. Ulrich despised Santos's acts and cornered her to question her about them. At one point, he made her enter a small closet, out of view of the cameras and other officers, to ask her why she was bringing coffee to Russell. She asked him if his gripe was because Russell was African American, and Ulrich was bold enough to admit that he did not like that a Caucasian was bringing coffee to an African American.

32. Trbovich was subjected to treatment that was similar to the treatment Santos received. Plaintiff Trbovich was asked, "when will you give us white guys a chance," and whether it was true that the white guys could not sleep with her because she was interested in only African American men. Through the years, male officers made these types of statements to Plaintiff Trbovich dozens of times.

33. Additionally, Ulrich wrongfully accused Trbovich and Santos of sleeping with African American inmates and repeated these accusations to inmates as well as officers.

34. He followed Trbovich throughout the jail, looked for her when she was off duty, enlisted other officers to spy on her and report to him what she was doing, and otherwise displayed "stalking' behavior and signs of infatuation with Plaintiff Trbovich.

35. In fact, Ulrich used other Sergeants to follow Trbovich while she was on duty. Ulrich's conduct caused concern for the other female officers that used to have lunch with Trbovich and workout with her during their breaks. Ulrich's stalking behavior, and his use of other Sergeants to join in the action, caused Trbovich's female co-workers to abandon her and avoid her so that they did not also become the subject of his stalking and harassing behavior.

36. Trbovich found her self alone, and often times eating lunch alone. All of her female co-workers were avoiding her, and in turn, she lost any cover or protection most expect to have

when they are in numbers. Consequently, Trbovich began hiding in the women's bathroom to avoid Ulrich and the other Sergeants that were following her on a regular basis.

37. Numerous superior officers made disparaging remarks to Trbovich and Santos about having a child that has an African American father. Trbovich heard some of her peers in the workplace making comments stating that black people stink, that they have a certain odor, and other negative comments about African Americans.

38. These racially offensive remarks continued throughout Plaintiffs' careers.

39. These racially offensive statements presented a hostile work environment for African American employees, and non-African American women that had romantic involvement with an African American man. But they also evidence the racist nature of the Department and some of its supervising officers.

40. This animus towards African Americans also evidences the retaliation and discrimination prevalent in the Department.

41. The Department regularly ignored complaints about racial harassment. The Department refused to investigate these allegations, and it did not discipline those responsible for the unlawful conduct. The Department, by choosing to ignore complaints by African Americans of racial harassment, refusing to investigate those complaints, and refusing to discipline the guilty parties, committed additional acts of harassment and ratified the discriminatory conduct.

42. But that is not the end of the story. The Department also retaliated against African Americans that complained about racial harassment.

43. Sheriff Laurie Smith has expressly stated that she and the Department would punish Plaintiff Allen in 2003 for filing a lawsuit alleging that the Department was racist. She promised to send people after him and get rid of him no matter what it took. This threat was also directed towards Orlando Walker, an African American Sheriff that was serving as the President of Allen's Union. This Union was paying for the attorneys that were suing the Department.

44. Sheriff Smith made good on her threats. Since filing his first lawsuit against the Department in 2003, Allen has been the subject of at least a dozen Internal Affairs investigations. With the exception of one, all of these investigations have been rejected as lacking evidence to

6
COMPLAINT FOR DAMAGES                                                CASE NO. _____

support finding that Allen did anything worthy of being investigated.  And the lone incident that resulted in discipline against Allen involved another officer admitting that he challenged Allen to a physical confrontation for the purpose of sending a threat.

45. Smith was also successful in having a letter of reprimand issued against Allen in response to a complaint Allen filed against Sergeant Quadros for sexual harassment in 2011. Quadros made a suggestive comment to Allen in front of another officer encouraging him to "look at her ass." Allen was not interested in playing sexual games and engaging in sex-related banter with Quadros.  He did not reciprocate her interest, so he became the subject of her harassment in retaliation for his disinterest.

46. Allen filed a complaint against Quadros for sexual harassment and retaliation.  The Department of Corrections investigated and sustained his complaint against Quadros.

47. However, when the results were given to Sheriff Smith for her to address, she ignored those results, threw them out, and charged Allen with insubordination for filing a complaint against Quadros.

48. The Department ignored at least one dozen of Allen's complaints regarding various types of discrimination, harassment, and retaliation.  The decisions to ignore these complaints is not only typical of the Department, but it is consistent with the Department's culture of protecting "its own" and discouraging African Americans from filing future complaints and lawsuits.  Indeed, the union has numerous stories of the Department "losing" complaints, or claiming that no complaints were made, only to later recall that a complaint was made and then purport to "settle" the complaint.

49. The Department's culture and conduct creates hopelessness and sends the message that complaints go nowhere and result in nothing but harsh reprisals.  The reprisals against Allen have included criminal charges and undue scrutiny for the purpose of discrediting, embarrassing, and oppressing him.

50. Sheriff Smith's dislike for Allen was well-known and regularly repeated to Allen by his superior officers.  He was told that he was a "target" because of his prior lawsuit against the

Department alleging racial discrimination. At least one of these officers is retired but can speak credibly about the vendetta Smith openly described against Allen.

51. Allen was also told that he was a target because he was an officer in the Union and had engaged in picketing with a sign stating that the Department was racist. Former superior Pete McCugh told Sean Allen that the Chief of the Department would never promote Allen because of his union activity. However, Caucasians that participated in union activity were not denied promotions.

52. This targeting and harassment was not limited to trying to fire Allen. He was also denied promotions. Allen was a training officer with a reputation for having an amazing presence and an unparalleled ability to manage volatile environments. He was also a decorated marksman that competed for the Department numerous times in his career.

53. But instead of being promoted and selected for jobs that he sought, the Department selected lesser qualified non-African Americans instead of Allen. These people had not previously sued the Department for racism, they had not previously picketed in front of the Department because of its racism, and they had not previously filed internal complaints about racism and harassment. Additionally, they had not refused to undergo new background checks in order to become Sherriffs.

54. Allen had more seniority than these officers, he had a longer tenure of successful and relevant experience, and he actually trained these officers. Allen was denied the positions because he is African American, and as acts of retaliation and punishment for his protected activity. This includes his union activity and his refusal to undergo intrusive background checks.

55. On information and belief, another example of complaints being swept under the rug or covered-up involve Sheriff Smith threatening a county clerk and taking a complaint that had been lodged against her.

56. The complaint involved allegations of Smith coercing a subordinate to have sex with her.

57. In addition to hiring lesser qualified African Americans and ignoring the applications of qualified African Americans, and in addition to creating a racially offensive work

8
COMPLAINT FOR DAMAGES                                            CASE NO. _____

environment while retaliating against African Americans that complained about racial harassment, and in addition to choosing not to promote better qualified African Americans, the Department also disciplined and terminated African Americans unfairly when compared to non-African Americans.

58. For example, Officer Council was found guilty of a "wet and reckless" due to driving with an illegal level of blood alcohol before he was hired by the Department. The Department still hired him although it knew of this prior conviction. While working for the Department, and while in a patrol car, he fell asleep at the wheel. As a result, he killed two people and seriously injured a third. The Department did not terminate Council.

59. On information and belief, Officer Langley shot someone in the back of the head and killed him. There were numerous media reports, including some captioned: "Coroner Confirms Man Shot In Back Of Head By Deputy" and "Killing By Deputy Has No Apparent Justification." Some eyewitnesses claimed to have seen an execution-style killing. The County paid millions of dollars to settle the lawsuit that followed the wrongful death of the person he killed. The Department did not terminate Langley. He was subsequently promoted.

60. Officer Tomosavich "fraternized" with a friend that was a convicted felon, and she allowed that felon to stay in her home as a guest. The Department's position is that this is a violation of a workplace rule and can result in termination. But the Department only suspended her for two weeks.

61. Ed Meyers, another Officer, had a conviction relating to driving while intoxicated. He was subjected to only a one week suspension. At that time, he was on probation as a Sergeant given his recent promotion. The Department did not demote him notwithstanding its ability to do so given his criminal conduct.

62. In 2013, Officer Guzman assaulted and severely beat up a cadet during the Academy. This Cadet's injuries were so severe that he could not continue in the Academy and had to be terminated. Instead of firing Guzman, he kept his job and has recently been promoted to serve as an Administrative Training Officer.

63. In addition to the facts discussed above regarding Allen being unfairly suspended because he responded to an act of provocation by another Officer, the Department's decision to terminate Trbovich reflects the Department's harassing and discriminatory conduct.

64. Trbovich, as discussed above, has a child with an African American father. Numerous supervising officers, including Ulrich, disliked the idea of women perceived as Caucasian having romantic relationships with African American men.

65. Consequently, Ulrich campaigned to terminate Trbovich by making up lies about her having sex with inmates, following her, coercing inmates to lie and say that they had sex with Santos and Trbovich, and investigating Trbovich while she was off-duty. These actions not only slandered and hurt Trbovich, but they made her work environment unsafe because Ulrich was encouraging inmates to try and have sex with her. Ulrich was making Trbovich and Santos sexual targets. Some of the inmates Trbovich and Santos supervised were convicted rapists and child molesters.

66. In addition to creating an unsafe work environment for Trbovich and Santos, Ulrich's false allegations about them were intended to paint them in the worst possible light. Indeed, arbitrator Norman Brand evaluated Trbovich's allegations that Ulrich harassed her and held that Ulrich's incredible behavior lacked credibility and gave credence to Trbovich's assertions that Ulrich harassed her.

67. Ulrich's unlawful and unhealthy obsession with punishing Trbovich led to him actually uncovering something that he could use against her. In doing so, the County not only validated Ulrich's unlawful motives, but it carried out a racially motivated adverse employment action.

68. In addition to the facts regarding Ulrich's racist comments and action, the bases for terminating Trbovich also show that she was treated differently because of her affiliation with African Americans.

69. The Department accused her of immoral conduct, conduct unbecoming of an officer, conduct that embarrassed the County and Department, poor standards and integrity, and other subjective rules. Notably, Ulrich, at minimum, committed actions that certainly fell within the

same prohibitions Trbovich was accused of violating.  But consistent with Department practice and custom, Ulrich was neither investigated nor disciplined for any of his actions.

70.     The Department ultimately terminated Trbovich.  But Caucasian superiors that did not have a history of having romantic relationships with African Americans enjoyed the freedom to sleep with each other in the workplace despite being married.  Sadly, many of these workplace sexual relationships were coercive because male superiors were using their authority to have sex with female subordinates.

71.     Additionally, even Sheriff Smith was accused of using her power to force a male subordinate to engage in sexual acts with her.

## FIRST CAUSE OF ACTION

**(Violation of the Civil Rights Act of 1964, 42 U.S.C. §§2000 et seq.)**

**(Racial Harassment, Discrimination, Retaliation, and Wrongful Termination)**

The allegations set forth above in paragraphs 1-71 are incorporated herein and set forth in full.

72.     By doing the things described above, Defendants harassed, retaliated against, and discriminated against Plaintiffs on the basis of their race.  Defendants also wrongfully terminated Trbovich on the basis of her race.

73.     As a direct and proximate result of Defendants' conduct, Plaintiff has suffered special damages in the form of lost earnings, benefits and/or out-of-pocket expenses in an amount according to proof at trial.  As a further direct and proximate result of Defendants' conduct, Plaintiff will suffer additional special damages in the form of lost future earnings, benefits and/or other prospective damages in an amount according to proof at trial.

74.     As a further proximate result of the wrongful conduct of Defendants, Plaintiff has suffered and continues to suffer humiliation, lack of self-confidence, embarrassment, emotional distress and mental anguish, all to his damage in an amount according to proof at the time of trial.

75.     In doing the acts herein alleged, Defendants acted with oppression, fraud, malice, and in the conscious disregard of the rights of Plaintiff, and Plaintiff is therefore entitled to punitive

COMPLAINT FOR DAMAGES                                                                                          CASE NO. _____

damages in an amount according to proof at the time of trial. Plaintiff is entitled to costs and reasonable attorney's fees pursuant to the statutes referenced herein.

76. Plaintiffs filed timely complaints with the Department of Fair Employment and Housing and the Equal Employment Opportunity Commission. Trbovich filed her applicable complaints and subsequent lawsuit following the exhaustion of her internal and administrative remedies under the doctrine of equitable tolling. An arbitrator found merit to some of the allegations raised herein and stated as much in an arbitration decision issued in March 2014. Accordingly, Plaintiffs received right to sue notices from the EEOC in July and August 2014.

### SECOND CAUSE OF ACTION

**(Violation of the California Fair Employment & Housing Act (FEHA)**
**(Racial Harassment, Discrimination, Retaliation, and Wrongful Termination)**

Plaintiffs incorporate paragraphs 1 through 76, inclusive, by reference as though set forth in full below.

77. By doing the things described above, Defendants harassed, retaliated against, and discriminated against Plaintiffs on the basis of their race. Defendants also wrongfully terminated Trbovich on the basis of her race.

78. As a direct and proximate result of Defendants' conduct, Plaintiff has suffered special damages in the form of lost earnings, benefits and/or out-of-pocket expenses in an amount according to proof at trial. As a further direct and proximate result of Defendants' conduct, Plaintiff will suffer additional special damages in the form of lost future earnings, benefits and/or other prospective damages in an amount according to proof at trial.

79. As a further proximate result of the wrongful conduct of Defendants, Plaintiff has suffered and continues to suffer humiliation, lack of self-confidence, embarrassment, emotional distress and mental anguish, all to his damage in an amount according to proof at the time of trial.

80. In doing the acts herein alleged, Defendants acted with oppression, fraud, malice, and in the conscious disregard of the rights of Plaintiff, and Plaintiff is therefore entitled to punitive damages in an amount according to proof at the time of trial. Plaintiff is entitled to costs and reasonable attorney's fees pursuant to the statutes referenced herein.

81. Plaintiffs filed timely complaints with the Department of Fair Employment and Housing and the Equal Employment Opportunity Commission. Trbovich filed her applicable complaints and subsequent lawsuit following the exhaustion of her internal and administrative remedies under the doctrine of equitable tolling. An arbitrator found merit to some of the allegations raised herein and stated as much in an arbitration decision issued in March 2014. Accordingly, Plaintiffs received right to sue notices from the EEOC in July and August 2014.

### THIRD CAUSE OF ACTION

### (Violation of 19 U.S.C. §1983)

### (Racial Harassment, Discrimination, Retaliation, and Wrongful Termination)

Plaintiffs incorporate paragraphs 1 through 81, inclusive, by reference as though set forth in full below.

82. Defendants have acted under the color of state law and violated Plaintiffs' rights, privileges and immunities protected under the Constitution of the United States. This includes the Fourteenth Amendment's right to equal protection.

83. By doing the things described above, Defendants harassed, retaliated against, and discriminated against Plaintiffs on the basis of their race. Defendants also wrongfully terminated Trbovich on the basis of her race.

84. As a direct and proximate result of Defendants' conduct, Plaintiff has suffered special damages in the form of lost earnings, benefits and/or out-of-pocket expenses in an amount according to proof at trial. As a further direct and proximate result of Defendants' conduct, Plaintiff will suffer additional special damages in the form of lost future earnings, benefits and/or other prospective damages in an amount according to proof at trial.

85. As a further proximate result of the wrongful conduct of Defendants, Plaintiff has suffered and continues to suffer humiliation, lack of self-confidence, embarrassment, emotional distress and mental anguish, all to his damage in an amount according to proof at the time of trial.

86. In doing the acts herein alleged, Defendants acted with oppression, fraud, malice, and in the conscious disregard of the rights of Plaintiff, and Plaintiff is therefore entitled to punitive

damages in an amount according to proof at the time of trial. Plaintiff is entitled to costs and reasonable attorney's fees pursuant to the statutes referenced herein.

87. This deprivation of rights, as alleged above and incorporated herein, including the rights as women to equal protection under the laws of the United States, gives rise to a claim under 42 U.S.C. § 1983.

## FOURTH CAUSE OF ACTION

### (Violation of California Constitution Article I, Section 31)

The allegations set forth above in paragraphs 1-87 are incorporated and set forth fully herein.

88. By doing the things, and causing the harm alleged in this lawsuit, Defendants harassed and discriminated against Plaintiffs in public employment giving rise to a claim for relief under California Constitution, Article I, Section 31.

89. Plaintiffs filed Government Tort Claims with the County. Trbovich filed her Claims following the exhaustion of her administrative remedies. Santos filed her claims within six months of the last act. The County unreasonably denied Plaintiffs' claims.

## FIFTH CAUSE OF ACTION

### (Violation of 42 U.S.C. §1981)

### (Racial Harassment, Discrimination, Retaliation, and Wrongful Termination)

Plaintiffs incorporate paragraphs 1 through 89, inclusive, by reference as though set forth in full below.

90. Defendants have acted under the color of state law and violated Plaintiffs' contractual rights as public employees, as well as their privileges and immunities protected under the Constitution of the United States. This includes the Fourteenth Amendment's right to equal protection.

91. By doing the things described above, Defendants harassed, retaliated against, and discriminated against Plaintiffs on the basis of their race. Defendants also wrongfully terminated Trbovich on the basis of her race.

92. As a direct and proximate result of Defendants' conduct, Plaintiff has suffered special damages in the form of lost earnings, benefits and/or out-of-pocket expenses in an amount according to proof at trial. As a further direct and proximate result of Defendants' conduct, Plaintiff will suffer additional special damages in the form of lost future earnings, benefits and/or other prospective damages in an amount according to proof at trial.

93. As a further proximate result of the wrongful conduct of Defendants, Plaintiff has suffered and continues to suffer humiliation, lack of self-confidence, embarrassment, emotional distress and mental anguish, all to his damage in an amount according to proof at the time of trial.

94. In doing the acts herein alleged, Defendants acted with oppression, fraud, malice, and in the conscious disregard of the rights of Plaintiff, and Plaintiff is therefore entitled to punitive damages in an amount according to proof at the time of trial. Plaintiff is entitled to costs and reasonable attorney's fees pursuant to the statutes referenced herein.

95. This deprivation of contractual rights, as alleged above and incorporated herein, including the rights as women to equal protection under the laws of the United States, gives rise to a claim under 42 U.S.C. § 1981.

## SIXTH CAUSE OF ACTION

### (Intentional Infliction of Emotional Distress)

Plaintiffs incorporate paragraphs 1 through 95, inclusive, by reference as though set forth in full below.

96. Defendants conduct, as alleged above, was extreme and outrageous, and beyond the scope of conduct which should be tolerated by citizens in a democratic and civilized society.

97. Defendants committed these extreme and outrageous acts with the intent to inflict severe mental and emotional distress upon Plaintiffs.

98. Defendants successfully caused Plaintiffs to suffer said severe emotional distress, resulting in pain, sadness, anxiety, depression, fear, post traumatic stress disorder, sleeplessness, anger, embarrassment, hurt and other physical and emotional injuries.

///

## SEVENTH CAUSE OF ACTION

## FAILURE/NEGLIGENT TRAINING AND SUPERVISION

### (Violation of 42 U.S.C. § 1983 and Public Policy)

Plaintiffs incorporate paragraphs 1 through 98, inclusive, by reference as though set forth in full below.

99.     As alleged above, the County and Sheriff inadequately trained its Sheriffs and Correctional Officers and had deliberate indifference to the rights of female employees.

## EIGHTH CAUSE OF ACTION

### (Retaliation in Violation of the First Amendment)

Plaintiffs incorporate paragraphs 1 through 99, inclusive, by reference as though set forth in full below.

100.    As alleged above, Plaintiffs associated with the union and exercised their rights as union members and individuals.  This includes electing not to participate in a new and intrusive background investigation that became a requirement for Sherriffs and correctional officers interested in being Sherriffs.

101.    As a result, Sheriff Smith, by way of policy, custom, and practice, systematically and routinely retaliated against Plaintiffs and other employees by subjecting them to harsher discipline, including termination, for conduct that did not result in similar discipline for Sherriffs that agreed to this background process.

## **PRAYER FOR RELIEF**

Plaintiffs pray for relief as follows:

1.      For general damages and special damages, including lost wages, in an amount according to proof;

2.      For compensatory damages in an amount according to proof;

3.      For exemplary and punitive damages against Defendants;

4.      For reasonable attorney's fees;

5.      For costs of suit herein incurred; and

6.      For such other and further relief as the Court may deem proper.

**DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a jury trial on all of the issues set forth above to the extent authorized by law.

DATED:  August 22, 2014

                            BENJAMIN LAW GROUP

                            By:        /s/ Na'il Benjamin
                                        NA'IL BENJAMIN
                                Attorney for Plaintiffs
                      JONA TRBOVICH, SHONDA SANTOS
                              and SEAN ALLEN

COMPLAINT FOR DAMAGES                    CASE NO. _____